**AMERICAN LIBRARY ASSOCIATION, et al., Appellants,**

v.

**William ODOM, Director, National Security Agency.**

**No. 86–5337.**

United States Court of Appeals, District of Columbia Circuit.

Argued Feb. 26, 1987.

Decided May 8, 1987.

Mark H. Lynch, with whom Charles Lister, Robert A. Green and Susan W. Shaffer, Washington, D.C., were on the brief, for appellants.

Douglas Letter, Atty., Dept. of Justice, with whom Richard K. Willard, Asst. Atty. Gen., Dept. of Justice, Joseph E. diGenova, U.S. Atty. and Leonard Schaitman, Asst.

Branch Director, Dept. of Justice, Washington, D.C., were on the brief for appellee.

Jane E. Kirtley and Elaine P. English, Washington, D.C., were on the brief for amicus curiae, The Reporters Committee for Freedom of the Press, urging the reversal of the Dist. Court decision.

Before RUTH BADER GINSBURG and BUCKLEY, Circuit Judges, and FAIRCHILD,* Senior Circuit Judge.

Opinion for the Court filed by Circuit Judge RUTH BADER GINSBURG.

RUTH BADER GINSBURG, Circuit Judge:

This case concerns public access to documents collected by one of the world's preeminent cryptologists; the thirty-three documents in question are part of a massive collection housed in a library maintained by a private foundation. Plaintiffs, a researcher and several library, historical research, and national security affairs associations,[1] assert that, in contravention of the first amendment, a government agency, the National Security Agency (NSA or Agency), has interfered with their access to the documents. But for the unauthorized and unconstitutional interference of the Agency, plaintiffs allege, the library would accord them access to the withheld papers. On cross-motions for summary judgment, the district court decided the case on the merits for the NSA; the court held, on the basis of facts not genuinely in controversy, that plaintiffs did not have a first amendment right of access to the materials. *American Library Association v. Faurer*, 631 F.Supp. 416 (D.D.C.1986).

We affirm the judgment dismissing the action, but we do so without reaching the merits. Plaintiffs claim a speaker-hearer (or communicator-reader) relationship with the library. They say "this is a case where government action is preventing a willing, private speaker from communicating infor-

mation to plaintiffs." Reply Brief for Appellants at 9. There is generally no right, however, "to hear what a speaker does not choose to say." *Frissell v. Rizzo*, 597 F.2d 840, 848 (3d Cir.), *cert. denied*, 444 U.S. 841, 100 S.Ct. 82, 62 L.Ed.2d 54 (1979).

Plaintiffs, we find, have not shown that they are adequate representatives of the library's interests, or that they can reliably convey that private speaker's will. Nor have they endeavored to join the foundation that maintains the library as a party in the action pursuant to Rule 19 of the Federal Rules of Civil Procedure (Joinder of Persons Needed for Just Adjudication). We therefore hold that plaintiffs are not positioned to maintain this case. With no warrant to stand-in for the speaker, they correspondingly lack standing to assert the right to hear. *See Frissell*, 597 F.2d at 848–49.

I. BACKGROUND

"The Friedman Collection on Cryptology" is housed at the George C. Marshall Research Foundation's Library (Marshall Library or Library), a private facility on the campus of the Virginia Military Institute in Lexington, Virginia. The Library houses the private papers of several former federal officers once prominently involved in the nation's defense, most notably, the papers of Secretary of State George C. Marshall.

William Friedman was for years the nation's foremost cryptanalyst; he devoted his extraordinary talent to the service of the United States as a long-term employee of the NSA and its predecessor agencies. Friedman retired in 1955 but continued thereafter to work for NSA as a consultant. He also began in his retirement years to review and catalog his massive collection of materials on cryptology and secret communication, consisting of several hundred books, technical monographs, arti-

---

* Of the United States Court of Appeals for the Seventh Circuit, sitting by designation pursuant to 28 U.S.C. § 294(d).

1. The named plaintiffs, appellants in this court, are researcher Jay Peterzell, the American Li-

brary Association, the District of Columbia Library Association, the Virginia Library Association, the American Historical Association, the Organization of American Historians, and the Center for National Security Studies.

facts, and memorabilia, plus voluminous correspondence. The Agency furnished some assistance to Friedman in storing his cryptology materials securely in his home, cataloging them, even filling in gaps in his collection. In August 1969, some months before his death, Friedman wrote to the George C. Marshall Research Foundation reporting his decision to convey his collection to that private foundation, for maintenance at the Marshall Library.

Friedman stated in his August 1969 letter to the Foundation that two considerations motivated his choice of the Marshall Library. The second consideration was the Foundation's "agree[ment] to keep the Collection intact."[2] The first was Friedman's understanding that the Library "would be approved as an institution which could keep valuable or classified papers relating to our National Security or to our National Defense."[3] In December 1970, after Friedman's death, his Collection on Cryptology was transported from his home in Washington, D.C., to the Marshall Library. NSA provided for secure shipment of the collection to safeguard the materials and facilitate the in transit insurance arrangement.

While employed at NSA, in February 1954, Friedman had signed a secrecy oath.[4] The oath acknowledged Friedman's obligations not to disclose information concerning NSA, and stated, *inter alia:*[5]

> [U]pon ... severance of my connection with the National Security Agency, I will not reveal ... my connection with or knowledge of communications intelligence or communication security operations unless freed from this obligation by unmistakable and categorical official notice....

NSA, however, never set out by written agreement a statement of the terms and conditions under which the Friedman Collection would be kept at the Marshall Library. In contrast, the Department of the Army had entered into an agreement with the Marshall Foundation in 1967 concerning the Library's maintenance of Army-originated papers containing classified information;[6] Friedman had referred to this 1967 agreement in his August 1969 letter concerning the gift of his cryptology collection.[7]

The Friedman Collection, lodged in the Marshall Library in December 1970, was opened to the public in January 1978. Prior to that time, for two weeks late in 1975, Friedman's biographer, British writer Ronald Clark, enjoyed unrestricted access to the entire collection. (Friedman's wife had requested that the collection stay closed to the general public until publication of the biography. The biography, titled *The Man Who Broke Purple, The Life of the World's Greatest Cryptologist, Colonel William F. Friedman,* was published by Little, Brown and Co. in 1977.) In addition to Clark, NSA officials had examined the materials in the years between 1970 and 1978. Two inspections were made in 1971,

---

**2.** Letter dated August 1, 1969 from William F. Friedman to Dr. Forrest C. Pogue, Executive Director, George C. Marshall Research Foundation, at 3, *reprinted in* Joint Appendix (J.A.) at 43, 45. A room at the Library is devoted to the Friedman Collection other than correspondence. *See* June 4, 1985 Deposition of John N. Jacob, Archivist of the Marshall Research Foundation, at 99–101. The Friedman correspondence is kept with all the Library's correspondence files in another room. *See* December 16, 1985 Declaration of John N. Jacob, Archivist of the Marshall Research Foundation, at 1–2, *reprinted in* J.A. at 83, 83–84.

**3.** Friedman Letter, *supra* note 2, at 3, *reprinted in* J.A. at 45.

**4.** National Security Agency Oath, NSA Form G170 (rev 7 Jan 54), *reprinted in* J.A. at 41–42.

**5.** *Id.* at 41.

**6.** Agreement on the Safeguarding of and Access to United States Army-Originated Papers Containing Classified Defense Information Deposited with the George C. Marshall Research Foundation, Lexington, Virginia, dated November 9, 1967, signed by Omar N. Bradley for the George C. Marshall Research Foundation and Kenneth G. Wickham, Adjutant General, for the Department of the Army, *reprinted in* J.A. at 47–50.

**7.** Friedman letter, *supra* note 2, at 3, *reprinted in* J.A. at 45 ("I am glad that the Foundation's Library has now been given full authority to handle classified documents under an agreement signed by the President of the Foundation and The Adjutant General of the Army.").

and one in 1974, to organize the materials and assess their historical significance. In July 1975 and November and December 1976, NSA undertook classification review of the documents.[8] During the 1976 review,[9] certain documents in Friedman's correspondence files were segregated as "sensitive." NSA did not then label that material "classified," but the Library's archivist agreed to remove items in the "sensitive" category from the open shelves.

Thus, when the public was admitted to the Friedman Collection in 1978, two categories of materials were withheld: classified documents; and items of correspondence NSA had identified in 1976 as sensitive. In October 1979, without informing NSA, but apparently without intent to defy the Agency's instructions, the Library's archivist opened to the public the correspondence declared sensitive in 1976, and held back only the items in the classified category.[10] This action went unnoticed by NSA until 1983.

Some declassification and reclassification of books, pamphlets, and monographs occurred in 1981,[11] but NSA reviewers did not that year examine the Friedman correspondence files. A book about the NSA published in 1982[12] led the Agency to suspect that the sensitive Friedman correspondence segregated in 1976 had been made available to the public sometime after the Collection opened in 1978. In an April 1983 visit to the Library, NSA officials discovered that the sensitive documents had indeed been accessible to Library visitors since October 1979. These officials approved continued public access to some of the documents once in the sensitive category, classified a few of the items labeled sensitive in 1976, and asked the Library, pending continuing NSA review, to seal as still sensitive (albeit not then classified) several of the documents identified in 1976, along with some additional material earlier thought to be nonsensitive.

Precipitating this lawsuit, in May and June 1983, Jay Peterzell, a research associate at the Center for National Security Studies, visited the Marshall Library, reviewed the large open portions of the Friedman Collection, and requested access to the withdrawn portions. On information from the Library about NSA's position regarding the withheld documents, Peterzell and the organizational plaintiffs wrote to NSA in January 1984; they asked the Agency to rescind its instructions to the Library, so that all Friedman Collection documents that at any time had been available for public inspection would be restored to open shelves. NSA promptly denied this request.

Eventually, between February and April 1984, NSA eliminated the separate, "sensitive" category; the Agency either classified or opened to the public all Friedman

---

8. It is not clear whether the reviewers classified any documents during these visits. *See* April 16, 1984 Affidavit of Meyer J. Levin, Chief, Information Policy Division, NSA, at 6–7, *reprinted in* J.A. at 29, 34–35. Some documents were already classified when the Library received them. *See id.* at 6, *reprinted in* J.A. at 34; April 16, 1984 Affidavit of Robert E. Rich, Deputy Director of NSA, at 6, *reprinted in* J.A. at 18, 23.

9. NSA learned sometime before August 1976 that Friedman's biographer, Ronald Clark, had discovered certain facts NSA regarded as extremely sensitive. Clark refused the Agency's request to review his manuscript, but NSA succeeded in persuading the publisher, Little, Brown and Co., to delete the sensitive material from the published version of the biography. May 8, 1985 Deposition of Vincent Wilson, a former NSA historian, at 63–68.

10. Communications between the Agency and the Library were notably casual. Tony Crawford, the archivist who opened the sensitive documents to the public in 1979, apparently believed that the restriction imposed in 1976 was no longer relevant, and his successor as archivist, John Jacob, was not au courant with the situation in the years preceding 1983. *See* Memorandum dated December 14, 1979 from Tony Crawford to Dr. Fred L. Hadsel, *reprinted in* J.A. at 51; Memorandum dated May 11, 1983 from John N. Jacob to Dr. Fred L. Hadsel, at 2–3, *reprinted in* J.A. at 78, 79–80.

11. In October 1981, NSA reclassified two technical monographs that had been open to the public since 1978 and declassified a third. That third monograph was reclassified in April 1983. *See American Library Ass'n,* 631 F.Supp. at 418, 421–22.

12. J. BAMFORD, THE PUZZLE PALACE (1982).

Collection materials. Three government publications [13] and thirty pieces of correspondence now reside in the classified category. In the confusion attending 1975–1984 classification, declassification, and reclassification of Friedman's books and papers, each of the currently classified items had been freely available to the public at the Marshall Library at one time. This litigation aims at permanent public disclosure of the thirty-three now classified items.

The complaint, filed in February 1984, alleges that NSA has no power to direct a private entity (the Marshall Library) to deny access to non-classified materials,[14] and that, once information has been made available to the public, NSA lacks authority to stamp it classified. NSA's unauthorized actions, researcher Peterzell and the organizational plaintiffs charge, interfere, in contravention of the first amendment, with the public access that the Library, if left alone by NSA, would grant to everything in the Friedman Collection. The complaint deliberately states no claim under the Freedom of Information Act, 5 U.S.C. § 552, and also deliberately refrains from naming the Marshall Foundation as a party.[15]

NSA responded to the complaint by moving to dismiss or for summary judgment. The district court allowed plaintiffs to pursue discovery before answering NSA's motion; upon completing their discovery, plaintiffs cross-moved for summary judgment. The district court then granted NSA's motion; it reasoned that: (1) section 6(a) of the National Security Agency Act of 1959,[16] reinforced by Friedman's secrecy oath, authorized NSA to control the Library's handling of Friedman Collection documents containing sensitive information about the Agency's activities, 631 F.Supp.

at 420; and (2) the first amendment did not block classification of documents previously available to the public "where their disclosure might endanger the national security," *id.* at 422. After reviewing *in camera* a classified affidavit of NSA's Deputy Director, the district court concluded that the Agency had properly classified the thirty-odd documents at issue because their "[d]isclosure ... could be reasonably expected to cause serious damage to the national security." *Id.* at 423. From this disposition of the merits of their complaint, plaintiffs appeal.

## II. DISCUSSION

Plaintiffs seek access to information they concede they could not obtain through a FOIA request. *See, e.g., Military Audit Project v. Casey,* 656 F.2d 724, 742, 744–45 (D.C.Cir.1981). The following colloquy occurred at oral argument on that point. Counsel for NSA had noted that NSA now possessed copies of the thirty-three Friedman Collection items still withheld from public view. The court inquired whether plaintiffs could request under FOIA access to the copies of the Friedman Collection items currently lodged at NSA.

> Counsel for plaintiffs: Yes, and I have no doubt about the outcome of that suit, your Honor. The affidavits [NSA] filed would be accepted by any district judge in the country and by any court of appeals as adequate to repel a FOIA request.

> Court: So what you are really arguing for is a more generous standard on getting access to classified information than you would have if you had to proceed the way requesters normally do, that is, under FOIA.

---

**13.** *See supra* note 11.

**14.** This portion of the complaint apparently became moot when NSA eliminated the "sensitive" although not (yet) classified category.

**15.** *But see* FED.R.CIV.P. 21 ("[p]arties may be dropped or added ... on motion of any party at any stage of the action"); 19(a) (person who should join as plaintiff but refuses to do so may be made a defendant).

**16.** Pub.L. No. 86–36, 73 Stat. 63, 64 (1959) (codified as amended at 50 U.S.C. § 402 note (1982)). The subsection provides, *in pertinent part,* that nothing in this Act or any other law ... shall be construed to require the disclosure of the organization or any function of the National Security Agency, or any information with respect to the activities thereof, or of the names, titles, salaries, or number of the persons employed by such agency. ·

Counsel for plaintiffs: Yes, because in our view the information at the Library is not properly classified because it had been already released by the Agency; duly authorized officials had made it available and in fact it was available.

The mere deposit of the Collection at the Library, plaintiffs acknowledged, did not release the materials from the undertaking embodied in Friedman's secrecy oath. *See supra* p. 83. But that oath, plaintiffs contend, gave NSA only the right to review the Friedman Collection for classified information *before* the Library opened the Collection to the public. *See* Brief for Appellants at 17. Once NSA had that opportunity and allowed the Library to display the materials,[17] plaintiffs maintain, "NSA renounced its control over the documents, and they became the unrestricted property of the Library pursuant to Mr. Friedman's gift." *Id.* at 20.

Whether the secrecy oath that bound Friedman continues to bind the Library, we hold, is a question plaintiffs are not positioned to litigate. The Library has made no claim that the secrecy pledges Friedman signed no longer control access to materials in the Collection. Nor has the Library asserted its willingness to display the documents—even if it could establish a legal right to do so—against NSA's plea that national security considerations warrant withholding the thirty-three items. Plaintiffs' case, we think it critical to recognize, is essentially derivative; their access claim posits a "willing, private speaker." *See supra* pp. 82, 83–85. But the record does not bear out the Library's qualification for "willing speaker" billing.

Plaintiffs used the discovery opportunity afforded them in the district court to inquire into the Library's readiness to communicate. They point to statements contained in the depositions of two Library officials to show that the Library was and

remains a willing speaker, thwarted by unjustified government interference. *See* Brief for Appellants at 13. The featured statements do show annoyance and frustration over NSA's instructions to hold back materials the Agency declared "sensitive" but did not classify. As one of the officials said: [18]

> [T]he material that had been withheld but not classified ... was an embarrassment to us ... and we felt they should either classify it or put it on the shelf.

In the same vein, the other official commented: [19]

> The thing that gave us a problem ... was material that they did not feel was classified but we were requested to remove from open shelves. This was our basic problem.
>
> We didn't have any problem with classified material. ...·

Once NSA eliminated the "sensitive" but not classified category, by either classifying the documents or advertently releasing them from the secrecy pledge, the Library's "problem," it appears, was overcome. We find no indication that the Library presented itself as a willing communicator after NSA, in the words of a Library official[20]

> c[a]me down and ha[d] a look at the material and [did] what [the Library] had been asking all along, to either classify the material or open it.

A reader's interest in dislodging a government-imposed restraint on another's communication has been insightfully analyzed as "fundamentally analogous" to a claim of "standing to assert the rights of a third party." *Frissell*, 597 F.2d at 848. Courts have rejected such claims where the litigant and the third party whose rights the litigant seeks to raise may have divergent interests. *See generally* Rohr, *Fighting for the Rights of Others: The Troubled Law of Third Party Standing and*

17. *See supra* pp. 83–85, recounting that each of the currently withheld items had been open to public view at the Library at one time.

18. June 4, 1985 Deposition of Fred L. Hadsel, Director of Marshall Research Foundation, at 116.

19. June 4, 1985 Deposition of Royster Lyle, Jr., Supervisor of Collections of Marshall Research Foundation, at 43.

20. *Id.* at 132.

*Mootness in the Federal Courts*, 35 U.MIA-MI L.REV. 393, 456–61 (1981) (setting out cases in point).[21] This is such a case.

The Library has never objected to classification reviews by NSA, it has objected to a limbo category of unclassified but nonetheless withheld papers, it has urged—and apparently does not now object to—firm decisions by NSA either to open documents or to classify them. The arrangement between NSA and the Library concerning the Friedman Collection, from the start, *see supra* pp. 83–85, has been notably informal. Neither side, it appears, felt a need for a written agreement. Both viewed the arrangement as advantageous to the participants and the public.

Absent a solid basis on which to conclude that plaintiffs' interests and the Library's in displaying the thirty-three documents are congruent, we hold that plaintiffs' claim cannot be maintained. Plaintiffs, no doubt, are eager to know what the documents in contention contain. But the Marshall Library, in view of its beneficial relationships with federal officers and agencies concerned with national defense, has not been shown to be a willing communicator. In these circumstances, precedent rules out adjudication of plaintiffs' plea. *See, e.g., Davis & Farnum Mfg. Co. v. Los Angeles*, 189 U.S. 207, 23 S.Ct. 498, 47 L.Ed. 778 (1903); *Friedman v. Harold*, 638 F.2d 262, 265–68 (1st Cir.1981); *Frissell*, 597 F.2d at 848–50; *School Dist. of Kansas City, Mo. v. Missouri*, 460 F.Supp. 421, 439–42 (W.D.Mo.1978); *Mercer v. Michigan State Bd. of Educ.*, 379 F.Supp. 580, 584 (E.D.Mich.), *aff'd mem.*, 419 U.S. 1081, 95 S.Ct. 673, 42 L.Ed.2d 678 (1974).

**21.** Plaintiffs cite *Virginia State Bd. of Pharmacy v. Virginia Citizens Consumer Council, Inc.*, 425 U.S. 748, 96 S.Ct. 1817, 48 L.Ed.2d 346 (1976), as supportive of their standing. There, consumers successfully challenged a state-imposed ban on price advertising for prescription drugs. The Supreme Court noted, however, the parties' stipulation that, in the absence of the state's ban, "some pharmacies" would publish price advertisements. *Id.* at 756 n. 14, 96 S.Ct. at 1823 n. 14. *See also Frissell*, 597 F.2d at 846–50.

Here, it is far from clear that the Library would risk the beneficial, longstanding relationship it has maintained with federal officers and agencies concerned with national defense in order to open at once to public view the three government publications and thirty items from Friedman's correspondence files NSA has sought to shelter. *Cf. Adams v. Bell*, 711 F.2d 161, 170 & n. 41 (D.C.Cir.1983) (en banc) (court cannot exercise article III jurisdiction if injunction appellants seek would not remedy the injury that brings them to court), *cert. denied*, 465 U.S. 1021, 104 S.Ct. 1272, 79 L.Ed.2d 678 (1984).

## CONCLUSION

For the reasons stated, we hold that plaintiffs lack standing to challenge NSA's arrangement with the Marshall Library regarding the Friedman Collection and, on that basis, we affirm the judgment dismissing the complaint.

*It is so ordered.*